UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | |
|---|---|
| JULIE A. SU, <br> Acting Secretary of Labor, <br> United States Department of Labor, <br><br> Plaintiff, <br><br> v. <br><br> IKES ARTISAN PIZZA, L.L.C. <br> and ISAAC MARTIN AUSMUS, <br><br> Defendants. | Civil Action No. 6:22-cv-00217-CHB-HAI <br><br><br> **MEMORANDUM OPINION** <br> **AND ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by Defendants Ike's Artisan Pizza, LLC ("Ike's Artisan Pizza")[1] and Isaac Martin Ausmus. [R. 22]. Plaintiff, the acting Secretary of Labor Julie A. Su, responded, [R. 23], and Defendants replied, [R. 28]. The matter is therefore fully briefed and ripe for consideration. For the following reasons, Defendants' motion will be denied.

I.   **BACKGROUND**

The record in this matter is replete with disputed facts and contradictory statements by multiple individuals. However, in summarizing the evidence of record, the Court attempts to focus on the *material* facts at issue.

Amber Roberts began working at Ike's Artisan Pizza on December 28, 2021. [R. 22-2 (Onboarding Documents)]. Six months later, on July 18, 2022, Roberts called the Kentucky

---

[1] Defendants' filings indicate that the proper spelling of the restaurant's name is "Ike's Artisan Pizza" rather than "Ikes Artisan Pizza." *See, e.g.*, [R. 22-1].

1

Labor Cabinet to discuss her concern that Ike's Artisan Pizza might not be paying her correctly.[2] [R. 22-3, pp. 37:11–25, 40:16–25, 41:3–16, 50:1–2 (Roberts Deposition); R. 22–11, pp. 35:13–25, 36:1–13 (Wilder Deposition)].[3] She did not file a formal complaint on that day. [R. 22-3, pp. 40:22–25, 41:1–2]. However, she did tell at least two other employees at Ike's Artisan Pizza that she had called the Labor Cabinet and inquired about the restaurant's pay practices. *Id.* at 52:17–22.

That evening, Roberts completed her shift and walked out of the restaurant with some other employees. *Id.* at 54:19–21, 59:1–11. As she was walking to her car, her coworker Elena Cope asked her if she had "put [her] shift up" on a scheduling app,[4] because she had received a notification that Roberts was no longer listed as working certain shifts and those hours were instead "up for grabs" by other employees.[5] *Id.* at 55:3–19, 56:2–7. Roberts had not put her shifts up on the scheduling app. *Id.* at 57:8–23. Elena noticed that "more shifts [were] coming up," and Roberts started laughing and joking that she must have just gotten fired. *Id.* 60:10–12; *see also* [R. 23-2 (Cope Declaration)].[6]

---

[2] Defendants concede that there is "sufficient evidence under a summary judgment standard" to demonstrate that Roberts called the Kentucky Labor Cabinet on July 18, 2022. [R. 22, p. 2 n.2].

[3] To the extent the page numbers listed on depositions or other documents differ from the page number assigned by the Court's electronic docketing system, the Court cites to the page number listed on the document.

[4] Roberts mentions "Seven Shifts" in her deposition, [R. 23-2, p. 55:21–24], which appears to be a scheduling application. *See* [R. 22, p. 3 (referencing "7shifts")].

[5] In her statement to the Department of Labor, Roberts states that she "noticed that my work shifts were taken off the 7-Shifts application." [R. 22-4, p. 2]. Defendants suggest that this conflicts with Roberts's statement that co-worker Elena Cope noticed that Roberts's shifts were available on the app. [R. 22, p. 3]. While the Court disagrees, this fact is not material.

[6] In their reply brief, Defendants briefly argue that Cope's declaration should be "largely disregarded" as inadmissible hearsay. [R. 28, pp. 10–11]. Because Defendants raised this argument for the first time in their reply brief, Plaintiff has not had an opportunity to respond. However, the Court notes that, where hearsay evidence can be presented in an admissible form at trial, it may be considered on summary judgment. *See Barry v. Lyon*, 834 F.3d 706, 722 (6th Cir. 2016). Here, the alleged hearsay statements at issue could be offered for a reason other than the truth of the matter asserted (i.e., to show that Roberts *thought* she had been fired, rather than to show Roberts had been fired), or they might fall within some other hearsay exception (e.g., the excited utterance exception). *See*

Thinking that there must have been a scheduling mistake, Roberts went back into the restaurant to ask why her shifts had been "put up." [R. 22-3, pp. 58:5–10, 60:12–17]. At this point, she alleges that she had a conversation with Defendant Ausmus, a part owner of Ike's Artisan Pizza. *Id.* at 62:3–12; [R. 22-7, pp. 30:5–7 (Ausmus Deposition, stating that he is part owner of the restaurant)]. She alleges that she asked Ausmus why her shifts had been removed, to which he responded along the lines of, "I had heard you called the labor cabinet and you're thinking about putting your two weeks in anyway, so we don't need that here, you're no longer welcome to work for me or my future companies." [R. 22-3, p. 62:3–12]; *see also* [R. 22-4, p. 2 (Roberts's Statement to U.S. Dept. of Labor)]. In her deposition, Roberts testified that, while Ausmus never said she was fired, she inferred as much from this conversation.[7] [R. 22-3, pp. 76:25, 77:1–3]. And when asked whether Ausmus's statements were "[u]p for interpretation," she explained that she "took it as a clear, you know, you're fired." *Id.* at 63:2–3. At least one other employee witnessed a conversation take place between Ausmus and Roberts after Roberts's shift ended, but he "was not sure what it was about," and he did not know if Roberts was terminated at that time. [R. 22-8, p. 2 (McCudden Statement)].

Roberts testified that, after the above-quoted conversation, she then asked Ausmus whether he wanted her two-weeks' notice. *Id.* at 63:7–9. She explained that she had prepared a written resignation and had it on her person, but she had not planned on quitting that night. *Id.* at 63:9–11. She explained that she "was assuming if he wanted me gone I could at least work two

---

*generally* Fed. R. Evid. 803(2). Moreover, even without Cope's Declaration, there still exists genuine disputes of material fact in this case, thus precluding summary judgment.

[7] In her statement with the Department of Labor, Roberts states that, after the above-recited conversation with Ausmus, she offered him her two-weeks' notice, "and he rejected it and told me that I was fired." [R. 22-4, p. 2]. However, in her deposition and briefing, she does *not* represent that Ausmus expressly fired her; rather, she states that she *inferred* that she was terminated based on the July 18, 2022 conversation. *See, e.g.*, [R. 22-3, pp. 76:25, 77:1–3]; [R. 23, p. 2].

3

more weeks." *Id.* at 63:12–14. She testified that Ausmus replied, "nope, that won't be necessary," to which she responded "okay," and he replied, "have a good night." *Id.* at 63:15–17. Roberts then began to walk out of the restaurant, apparently through the kitchen, where she stopped to talk to another employee and explained to that employee that she had just been fired and "was very confused." *Id.* at 63:17–22, 67:20–25, 68:1–20. She testified that Ausmus "was walking back as I was walking out," and "I think he kind of gestured and said like employees only or something, we're closed for the night, something like that." *Id.* at 63:22–25, 64:1, 69:1–7. Roberts then walked back outside, where she told Elena Cope and another coworker that she had just gotten fired. *Id.* at 69:12–25; *see also* [R. 23-2 (Cope Declaration)].

Mr. Ausmus denies that he made any changes to Roberts's scheduling, [R. 22-7, p. 97:7–18], and he testified that he could not recall having a conversation with Roberts on the evening of July 18, 2022. [R. 22-7, pp. 25:23–25, 26:1–6]. In his earlier sworn statement to the United States Department of Labor, however, Ausmus stated that Roberts became upset during her shift that evening and "walked out." [R. 23-3]. Ausmus made similar notes in the restaurant's payroll software, claiming that Roberts "walked out around 9:00pm," and he "auto clocked her out at 10:30pm" and realized she had not closed out. [R. 23-4]. Those same notes list Roberts as a "no call now show" for July 19, 2022, and show that Roberts was terminated for abandoning her job. *Id.* Ausmus made these notes "[a] couple of weeks, maybe a month" after the listed dates. [R. 22-7, p. 56:1–7]. However, in his deposition, Ausmus claims that he was told by another person that Roberts had walked out that night, but he could not recall who told him, and he "know[s] now that she did not walk out." [R. 22-7, pp. 15:20–25, 16:1–3]. He also acknowledged in his deposition that Roberts worked her full shift on the evening of July 18, 2022. *Id.* at 26:7–11.

4

The next day, July 19, 2022, Ms. Roberts did not return to work. *See* [R. 22-7, pp. 71:12–25, 72:11–25, 73:1–25]. She claims that, as a result of her July 18, 2022 conversation with Mr. Ausmus, she believed she had been fired. [R. 22-3, pp. 76:25, 77:1–3]. Ausmus, on the other hand, claims that employee Elena Cope came to Ike's Artisan Pizza that day and advised that she and Roberts had quit. [R. 22-7, pp. 71:12–25, 72:11–25, 73:1–25]. Cope has stated, however, that, while she did return to Ike's Artisan Pizza on July 19, 2022 to quit, she "did not tell [Ausmus] that [Roberts] was quitting." [R. 23-2 (Cope Declaration)]. Cope stated that she understood Roberts had been fired the evening prior. *Id.*

Also on July 19, 2022, Roberts filed a complaint with the Kentucky Labor Cabinet, alleging primarily that her wages were not paid correctly. [R. 22-9 (Kentucky Labor Cabinet Complaint)]. In the complaint, Roberts also claimed she "was terminated for calling the labor board (retaliation)." *Id.* The July 19, 2022 complaint was subsequently closed when the Kentucky Labor Cabinet determined that Ike's Artisan Pizza was paying Roberts correctly. [R. 22-5 ("After my explanation, she stated that she understood and the issue was resolved."); R. 22-10 (Aug. 11, 2022 Letter)]. Roberts eventually contacted the United States Department of Labor and alleged she had been fired on July 18, 2022 in retaliation for contacting the Kentucky Labor Cabinet. *See, e.g.*, [R. 22-4].

On November 21, 2022, former Secretary of Labor Martin J. Walsh brought this action under the Fair Labor Standards Act ("FLSA") for Defendants' alleged firing of Roberts in retaliation for speaking to the Kentucky Labor Cabinet about her wages. [R. 1]. Defendants have now filed a Motion for Summary Judgment, [R. 22], which is fully briefed. [R. 23 (Response); R. 28 (Reply)]. For the reasons set forth herein, the Court finds that there exists genuine disputes of material fact, and the Court will therefore deny the motion.

5

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

## III. ANALYSIS

### A. FLSA Claim

As noted above, the Secretary of Labor filed this single-count complaint alleging a violation of the FLSA's anti-retaliation provision. *See* [R. 1, ¶¶ 11–13]. Under that provision, it is unlawful

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). The FLSA further provides that employers who violate this anti-retaliation provision shall be liable for, among other things, "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3). . . including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The Secretary of Labor may bring an action seeking such relief on behalf of an employee. *Id.*

A plaintiff may prevail on an FLSA retaliation claim "upon a showing of either direct evidence of retaliation or circumstantial evidence of retaliation." *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 235 (6th Cir. 2017) (citations omitted). "[D]irect evidence is that evidence which, if believed, *requires* the conclusion that unlawful [behavior] was at least a motivating factor in the employer's actions." *Id.* (emphasis in original). In other words, "[d]irect evidence proves the existence of a fact without any inferences or presumptions." *Abbott v. Corwn Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) (quoting *Norbuta v. Loctite Corp.*, 181 F.3d 102, 1999 WL 357780, *1 (6th Cir. 1999)) (internal quotation marks omitted); *see also Gohl v. Livonia Public Schools School* District, 836 F.3d 672, 683 (6th Cir. 2016) (describing direct evidence as a "smoking gun" and noting that "[d]irect evidence explains itself" (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013))) (internal quotation marks omitted). Thus, to prevail under a theory of direct evidence, a plaintiff must

7

show both "blatant remarks" that reveal the employer's retaliatory intent, and that the retaliatory intent was a motivating factor in the employer's actions. *Mansfield*, 706 F. App'x. at 235–36; *see also Kalyango v. Ohio Univ.*, 2:22-CV-2028, 2024 WL 1155855 (S.D. Ohio Mar. 18, 2024) at *4 (discussing direct evidence requirements in the context of an FLSA claim). If the plaintiff establishes such direct evidence of retaliation, "he may prevail without proving all the elements of a prima facie case of discrimination." *Adams v. Nature's Expressions Landscaping, Inc.*, 5:16-cv-98-JMH, 2018 WL 4390721, *8 (E.D. Ky. Sept. 14, 2018) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)); *see also Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 511 (2002) (explaining that, in context of a Title VII discrimination claim, "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case" (citing *Trans World Airlines, Inc.*, 469 U.S. 111)).

On the other hand, if the plaintiff is relying on circumstantial evidence, the court must engage in the *McDonnell Douglas* burden-shifting analysis. *See Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Mansfield*, 706 F. App'x at 236 (citation omitted). Under that framework, the plaintiff must first establish a prima facie case of retaliation by proving that

> (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Adair*, 452 F. 3d at 489. "Such a prima facie showing of retaliation 'creates a presumption that the employer unlawfully discriminated against the employee.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). If the plaintiff makes such a showing, "the burden then shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (citing *McDonnell Doughlas*, 411 U.S. at 802). If the defendant satisfies

8

this burden, the plaintiff then must prove "that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Id.* (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)).

In the present case, Defendants first argue that Plaintiff has no direct proof of retaliation. [R. 22, p. 8]. Defendants next argue that, with respect to a prima facie case, (1) Roberts did not engage in a protected activity, and even if she did, Ausmus had no knowledge of it, *id.* at 9–12; (2) Roberts did not suffer an adverse employment action, *id.* at 12–13; (3) even if Roberts engaged in protected activity and suffered an adverse action, there is no causal link between the protected activity and the adverse action. *Id.* at 13–14. Defendants also argue that, assuming a prima facie case exists, there exists a legitimate reason for the alleged adverse action, namely, Roberts's decision not to return to work, and Plaintiff cannot demonstrate pretext. *Id.* at 14–16.

In considering these arguments, the Court notes that the disputed conversation that allegedly took place between Roberts and Ausmus on the evening of July 18, 2022 is central to this case. In that statement, Ausmus purportedly states that he (1) had knowledge of Roberts's call to the Labor Cabinet and that she had been thinking about quitting, (2) he did "not need that here," and (3) as a result, Roberts was "no longer welcome to work for me or my future companies." [R. 22-3, p. 62:3–12 (Roberts Depo.)]; [R. 22-4, p. 2 (Roberts's Statement to U.S. Dept. of Labor)]. Roberts testified that this conversation took place after her shift on July 18, 2022, and as noted above, at least one employee witnessed a conversation between Roberts and Ausmus around this time (though he did not know what was said), and Cope's Declaration also largely corroborated Roberts's version of events. *See* [R. 22-3, p. 62:3–12]; [R. 22-4, p. 2]; [R. 23-2 (Cope Declaration)]; [R. 22-8, p. 2 (McCudden Statement)]. On the other hand, Ausmus initially claimed that Roberts walked out on her shift earlier that night, [R. 23-3]; [R. 23-4],

9

though he later retracted that statement and testified that Roberts worked a full shift, and he could not recall having a conversation with her that evening. *See* [R. 22-7, pp. 15:20–25, 16:1–3, 26:7–11].

A reasonable jury could weigh the evidence and the credibility of these witnesses and conclude that the above-described conversation took place, that Ausmus's alleged blatant comments not only demonstrate that he terminated Roberts, but that they reveal his retaliatory intent, and that the retaliatory intent was a motivating factor in his decision to terminate her. *See generally Mansfield*, 706 F. App'x. at 235–36. As such, a reasonable jury could find that direct evidence of retaliation exists. Or a reasonable jury could believe Ausmus's version of events and find no such direct evidence. Essentially, then, this factual dispute comes down to a question of credibility. It is not for this Court to weigh the credibility of witnesses at this stage of the proceedings, however. *See Render v. FCA US, LLC*, 53 F.4th 905, 914 (6th Cir. 2022) (explaining that "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited" (quoting *Kirilenko-Ison v. Bd. of Edu. of Danville Indep. Schs.*, 974 F.3d 652 at 660 (6th Cir. 2020))) (internal quotation marks omitted). For this reason alone, summary judgment is improper.

To be sure, however, the disputed conversation is also material to Plaintiff's prima facie case. For example, a reasonable jury could believe Roberts's version of events and, from Ausmus's statements, could conclude that Ausmus was aware that Roberts engaged in a protected activity under the FLSA. On this point, the Court notes that an unwritten, informal (and even internal) complaint can constitute a protected activity under the FLSA. *See Caudle v. Hard Drive Express, Inc.*, 91 F.4th 1233, 1239 (6th Cir. 2024) (raising concerns to an employer may qualify as a protected activity); *E.E.O.C. v. Romeo Community Schools*, 976 F.2d 985, 989 (6th

Cir. 1992) (same); *but see Rogers v. Webstaurant Store, Inc.*, 774 F. App'x 278, 280–81 (6th Cir. 2019) (explaining that an employee need not expressly mention the FLSA in an informal complaint, but they must at least give fair notice that they are complaining about overtime or a lack of fair compensation).

Moreover, even if Roberts's inquiry with the state Labor Cabinet did not qualify as the type of complaint sufficient to trigger protection under the FLSA, at least one court within this circuit has suggested that an employer's mistaken belief that an employee engaged in protected behavior is sufficient. *See Chao v. Norse Dairy Systems*, C-2-05-0826 2007 WL 2838958, *12 (S.D. Ohio Sept. 26, 2007) ("It is beyond question that employers make employment decisions based upon what they actually know to be true. Likewise, common sense and experience establish that employers also make employment decisions on what they suspect or believe to be true." (citing *BLRB v. Ritchie Mfg. Co.*, 354 F.2d 90, 98 (8th Cir. 1966); *Brock v. Richardson*, 812 F.2d 121, 124–25 (3d Cir. 1987); *Donovan v. Peter Zimmer America, Inc.*, 557 F.Supp. 642, 652 (D.S.C. 1982))).

On this issue, there exists a genuine dispute of material fact, namely, whether Ausmus believed that Roberts had made a complaint, informal or formal, to the state Labor Cabinet. On one hand, Roberts testified that Ausmus told her something along the lines of, "I had heard you called the labor cabinet," at which point he proceeded to tell her that he "[didn't] need that here" and "she was no longer welcome to work for me or my future companies." [R. 22-3, p. 62:8–12]. From this, a reasonable juror could understand that Ausmus was not only aware of Roberts's inquiry with the Labor Cabinet, but that he believed she had done more than just ask questions and had instead complained to the Labor Cabinet. On the other hand, Ausmus testified that he could not recall any such conversation, [R. 22-7, pp. 25:23–25, 26:1–6], and, while his testimony

11

is difficult at times to pin down, it appears that he testified that he was not aware of Roberts's July 18, 2022 call to the Labor Cabinet until some time after that date. *Id.* at 97:7–25, 98:1–25. Defendants also note Roberts's own testimony, where she acknowledged that Ausmus might have been referring to her attitude surrounding her call to the Labor Cabinet, rather than any actual complaint she might have made. [R. 22-3, pp. 62:22–25, 63:1]. As noted previously, while the Court must draw all inferences in favor of the non-moving party, *Anderson*, 477 U.S. at 255, it is not for the Court to weigh this evidence or judge the credibility of these witnesses when resolving a motion for summary judgment. *See Render*, 53 F.4th at 914.

    For that same reason, the Court concludes that there is a genuine dispute of material fact as to whether Ausmus terminated Roberts, as a reasonable jury could weigh the evidence and the credibility of the witnesses and conclude that Ausmus's statement that Roberts was "no longer welcome to work for [Ausmus] or [his] future companies," [R. 22-3, p. 62:11–12], was a clear indication that Roberts was fired. Similarly, even assuming that Defendants can provide a legitimate nonretaliatory reason for terminating Roberts, the disputed conversation also goes to the question of pretext. Simply put, a reasonable jury could conclude that, based on the alleged statements, any proffered legitimate reason did not actually motivate Ausmus's conduct. *See generally Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (explaining that a party can show pretext by demonstrating that the alleged legitimate reason lacks a basis in fact, did not actually motivate the employer's conduct, or was insufficient to warrant that conduct (citation omitted)). Or a reasonable jury could weigh the evidence and the credibility of the witnesses and conclude that Defendants' proffered nonretaliatory reason—i.e., that Roberts simply quit—lacks a basis in fact. *See id.*

Lastly, the Court feels compelled to briefly address Defendants' argument that Plaintiff cannot demonstrate a causal link between the alleged protected activity of calling the Labor Cabinet and the alleged adverse action of termination. [R. 22, pp. 13–14]. The entire basis for this argument seems to be that Ausmus was already aware of Roberts's concerns about the way she was paid and had already answered her questions about the pay system. *Id.* But the Court understands that the protected activity at issue is Roberts's call to the Labor Cabinet and Ausmus's belief that she had complained to the Labor Cabinet, not any prior discussion between Ausmus and Roberts. The Court therefore finds no merit in this causation argument.

In sum, a key piece of evidence at issue is Ausmus's alleged statement to Roberts on the evening of July 18, 2022. That evidence goes to Plaintiff's claim of direct evidence of retaliation, but Plaintiff also relies on it as circumstantial evidence demonstrating a prima facie case and pretext. There is a genuine dispute of fact surrounding this evidence. More specifically, there is a genuine dispute as to what conversation, if any, took place between Roberts and Ausmus on the evening of July 18, 2022. Given this disputed material fact, summary judgment is improper, and the Court will deny Defendants' motion to the extent they seek summary judgment on the issue of liability.

### B. Emotional Distress Damages

As previously noted, employers who violate the FLSA's anti-retaliation provision shall be liable for, among other things, "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3). . . including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The Sixth Circuit has concluded that this "broad provision"

13

allows for mental and emotional distress damages. *Moore v. Freeman*, 355 F.3d 558, 563 (6th Cir. 2004).

In the present case, the parties do not dispute the availability of emotional distress damages; instead, they disagree as to whether expert evidence is required to prove such damages. Defendants argue that expert proof is required in cases "where record evidence shows multiple competing causes of alleged emotional distress." [R. 28, p. 12]. They argue that this is just such a case, as Roberts has a history of anxiety and depression, she struggled with personal relationships, and she previously sought counseling for confusion about her schooling. *Id.* at 12–13; [R. 22, pp. 16–19]. Defendants argue that

> [w]ithout expert help, a jury would have no reasonable or principled way to understand how much of Ms. Roberts' (sic) alleged emotional injuries can and should be attributed to her significant prior history in terms of causation, as well as any that may or may not be fairly attributed to more contemporaneous alleged events.

[R. 22, p. 17]. Plaintiff does not directly respond to this argument, but instead insists that expert testimony is not mandated in an FLSA retaliation suit. [R. 23, pp. 20–24].

To support this position, Plaintiff cites primarily to *Moore v. Freeman*, 355 F.3d 558 (6th Cir. 2004). In that case, the Sixth Circuit held that damages for mental and emotional distress were available under the FLSA, as noted above, and the jury's award of such damages in that case was not clearly excessive. *Id.* at 563–64. In resolving the latter issue, the Court noted that "[t]he plaintiff in this case submitted evidence that the stress of losing his job demoralized him, strained his relationships with his wife and children, and negatively affected his sleeping habits and appetite." *Id.* at 564. In the factual background portion of the decision, the Sixth Circuit discusses this evidence in more detail, noting that Moore testified about his experiences and the effect on his mental and physical health. *Id.* at 561. The Sixth Circuit makes no reference to any

14

*expert* testimony or report. Plaintiff acknowledges as much, noting that the *Moore* Court was "silent" as to whether and under what circumstances expert testimony is required in such cases. [R. 23, p. 22]. Thus, the *Moore* case is largely unhelpful here.

To be sure, courts within this circuit do not require expert testimony or medical evidence in *every* case involving emotional distress damages under the FLSA. For example, in *Lacost v. Mod-Masters of Detection Security Services, Inc.*, 1:23-cv-475, 2023 WL 8378522 (W.D. Mich. 2023), *report and recommendation adopted*, No. 1:23-CV-475, 2023 WL 8369935 (W.D. Mich. Dec. 4, 2023), the district court explained,

> While there is no formula for the calculation of emotional distress damages and a plaintiff does not need to present medical evidence to receive compensation for emotional distress, "damages for mental and emotional distress will not be presumed and must be proven by competent evidence."

*Id.* at *2 (quoting *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996)) (internal quotation marks omitted). Indeed, in various other contexts, the Sixth Circuit and its district courts have consistently held that "[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden" of proving emotional distress damages. *Turic*, 85 F.3d at 1215 (citing *Meyers v. Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994)) (affirming damages award for emotional distress in Title VII lawsuit); *see also Rouse v. Michigan Dept. of State Police*, 1:08-cv-982, 2011 WL 3924495, at *5–6 (W.D. Mich. Sept. 7, 2011) (awarding emotional distress damages in Americans with Disabilities Act lawsuit); *McGuire v. Shipping Express Business Center, LLC*, 1:08 CV0473, 2010 WL 11538072, *3 (S.D. Ohio Aug. 6, 2010) (same); *Kelmendi v. Detroit Board of Edu.*, 12-14949, 2017 WL 1502626, *18 (E.D. Mich. Apr. 27, 2017 (refusing to vacate jury's award of emotional damages in a Title VII and Age Discrimination in Employment Act lawsuit); *Irvin v. City of Shaker Heights*, 1:06 CV 1779, 2012 WL 13028095, *4 (N.D. Ohio May 17, 2012) (denying

15

motion in limine because the plaintiff could prove his emotional damages claim by his own testimony in a § 1983 civil rights action).

Thus, the question in this case is not whether expert testimony is required to demonstrate emotional distress damages in *every* FLSA retaliation case. As the above-cited cases demonstrate, emotional damages can be proven without such expert testimony. The question currently before the Court is whether lay testimony is sufficient to prove emotional distress under the facts and circumstances of *this* case. More specifically, the Court must determine whether expert testimony is required given the evidence of other potential causes of Plaintiff's emotional distress. As noted above, Plaintiff fails to address this question, and Defendants' briefing fails to cite any binding authority, or even persuasive authority out of this circuit, for their position.

Thus, to answer this question, the Court turns first to Federal Rule of Evidence 701. That rule allows a lay person to provide testimony in the form of an opinion, so long as it is limited to one that is (1) "rationally based on the witness's perception," (2) "helpful to clearly understand the witness's testimony or to determining a fact in issue," and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," which governs expert testimony. *See* Fed. R. Evid. 701. Pursuant to this rule, courts within this circuit typically allow a lay person to testify as to their general symptoms, though "[l]ay opinion testimony on a specific medical diagnosis may not be admissible without proper expert support." *Williams v. Hamilton County, Tennessee*, 1:15-cv-74, 2018 WL 1586234, *2 (E.D. Tenn. Mar. 31, 2018) (citations omitted). Similarly,

> A plaintiff may testify as to when his or her symptoms began, and may even testify regarding causation, if that causation is within a lay person's realm of knowledge; but a plaintiff may not testify as to causation where technical or specialized testimony is necessary, such as where there are multiple possible causes of an injury or where specialized medical issues are involved.

16

*Id.* (citations omitted); *see also Leath v. Webb*, 5:17-cv-38-JMH, 2018 WL 4440682, *3 (E.D. Ky. Sept. 17, 2018) ("Ultimately, there are multiple potential causes for Leath's alleged emotional injuries and expert medical testimony is required to demonstrate that Leath suffered emotional distress as a result of the alleged [incident] that is relevant to this case."); *Kovacic v. Ponstingle*, 1:05CV2746, 2014 WL 4715859, *4 (N.D. Ohio Sept. 22, 2014) (requiring expert testimony where there was "no single, concrete incident from which plaintiffs can trace their alleged [emotional] injuries").

In the present case, Defendants argue that there are "competing contemporaneous causes" of Roberts's alleged emotional injuries, thus requiring an expert. [R. 22, p. 17]. Specifically, Defendants cite to Roberts's past history of depression and anxiety and the medication she took for those conditions, the "strong emotions" she suffered in response to a relationship with a coworker, and a counseling session "to discuss, in part, confusion about school." *Id.* at 17–18. However, the Court finds that Defendants' characterization of the evidence of record is largely exaggerated or is otherwise unsupported by the evidence.

Roberts testified in her deposition that, after the incident with Ike's Artisan Pizza, she "felt kind of gas lit," was "anxious," "did worse at job interviews," and was "scared to go out in public around that area anymore just because everybody knows everybody," and she felt "depressed." [R. 22-3, pp. 113:16–25, 114:1–4]; *see also id.* at 76:11–24 (discussing being "upset" that she had been fired), 104:11–18 (explaining that she was "at a pretty low point" after the incident, until she "got back on [her] feet"); 119:2–25, 120:1–25, 121:1–6 (explaining that she was scared of running into people she knew and "felt kind of anxious that I would bump into a reminder" so she avoided going out in public, and further explaining her feelings of anxiety).

17

Roberts also testified that she saw a school counselor at some point prior to her deposition, for a single visit, because she was "feeling upset" about the incident with Ike's Artisan Pizza "and where [she] was because of it." *Id.* at 17:9–25. She testified that her conversation with the counselor was "mostly Ike's related" though there may also "have been just some career talk, like feeling confused in school, maybe, or what I wanted to do, but it was mostly about Ike's." *Id.* at 79:2–12. When asked whether "the feeling confused in school and what you wanted to do" was causing her "some anxiety or stress," she responded, "Not really. . . . [M]aybe a little but not really." *Id.* at 79:13–18. Thus, while Defendants suggest that Roberts attended this counseling session primarily to discuss school-related issues, *see* [R. 22, p. 18], Roberts's testimony does not support that representation.

Defendants' characterization of Roberts's medical history is also, at best, incomplete and overstated. True, the record contains medical records, including notes from an emergency room visit, in which it is indicated that Roberts was receiving outpatient therapy and taking Prozac for depressive disorder, and she presented with "feelings of depression." [R. 22-14 (Medical Records)]. Medical records from that visit also indicate a "primary diagnosis" of depressive disorder. [R. 22-15 (Medical Records)]. However, this emergency room visit occurred in 2018, a fact omitted from Defendants' briefing. Indeed, in her deposition, Roberts testified that she had not been on any medications in the three years prior to that deposition (which was taken in 2023), [R. 22-3, p. 18:8–10]; she was not currently under a doctor's care and had not seen a doctor for "maybe two years," *id.* at 16:5–13; when she last saw a doctor two years earlier, it was "for general health and wellness," *id.* at 16:14–20; and she had not had any urgent care or hospital visits in the last three years, *id.* at 17:1–3. Defendants fail to cite any evidence

18

demonstrating—or even suggesting—that Roberts's 2018 mental health issues were at play during or after her employment with Ike's Artisan Pizza in 2022.

Defendants also cite to a series of text messages, allegedly about a personal relationship that Roberts was pursuing during her employment at Ike's Artisan Pizza. *See* [R. 22, pp. 17–18]; [R. 22-16]; [R. 22-17]; [R. 22-18]. Defendants claim that, in these texts, Roberts "expressed her frustrations" about that personal relationship, and she "displayed strong emotions" and "express[ed] doubt that she could trust anyone again and following (sic) news stories" about the individual "many months after their interactions, including before and after her separation from Ike's Artisan Pizza." [R. 22, pp. 17–18]. Again, the Court finds this description of the evidence to be inaccurate. The Court has reviewed the text messages and did not find any evidence of "strong emotions," nor any comments about being unable to trust anyone. *See* [R. 22-16]; [R. 22-17]; [R. 22-18]. As for Defendants' statement that Roberts was "following news stories" about her alleged romantic interest, *see* [R. 22, p. 17], the Court notes that another person texted Roberts about the romantic interest's apparent arrest, at which point Roberts replied, "Lol wtf is going on." [R. 22-18]. The conversation ended after the other texter replied, "I know no clue." *Id.*

Defendants argue that, based on this evidence, there exists competing causes of emotional injury, and as a result, expert testimony is required. [R. 22, pp. 16–18]]; [R. 28, pp. 11–13]. However, for the reasons outlined above, the Court finds that Defendants, as the moving party, have failed to satisfy their burden of demonstrating that an expert is required such that they are entitled to judgment as a matter of law on the emotional damages claim. *See, e.g.*, *Celotex Corp.*, 477 U.S. at 323 (1986) (explaining that the moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact"). At best, Defendants have pointed to unrelated mental health issues that took place several years prior to the incident at issue, with no evidence suggesting that those mental health issues existed during the relevant time period, and they have failed to point to any potential "competing *contemporaneous* causes" of Roberts's alleged emotional injuries. [R. 22, p. 17 (emphasis added)]. As such, they have failed to satisfy their burden, and the Court will deny their motion to the extent they seek summary judgment on the emotional damages claim.

## IV.     CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, **[R. 22]**, is **DENIED.**

This the 15th day of July, 2024.

*Claria Horn Boom*
CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY